Thank you, counsel. Welcome to another week of virtual arguments in the Eighth Circuit. It's not as good as open court, but it's been working. If you have technical difficulties at any time during the argument, be sure to let us know, and our technical people will help correct it, because we want to have a good oral argument. Probably got weather from here, North Dakota to Arkansas to deal with. Anyway, Mr. Churchwell? Good morning, your honor. If you're ready, we are. I don't think you've got your camera on. I can see Mr. Northwell. I just have is, oh, there we go. Please proceed. Thank you, Judge. If it please the court, my name is Joe Churchwell. I represent Brother Howe and Michelle Stanley and their children. This is an appeal of a dismissal of state defendants on a 12B6 motion, where the initial trial court granted qualified immunity to Major Ron Staton and Investigator Kathy Finnegan of the state police for perjury and fabrication of evidence. And it's an appeal of a summary judgment granted to the remaining defendants, specifically the same two state defendants, Staton and Finnegan, where qualified immunity was conferred to them based upon the trial court, second trial court, finding that reasonable suspicion existed at the time of the children's removal. Also going forward against Garland County deputies Michael Wright and Terry Threadgill, Wright for removal of the children or seizure without reasonable suspicion, perjury and fabrication of evidence, and Terry Threadgill for perjury and fabrication of evidence. This is a case where a child abuse hotline became a concurrent investigation between the Garland County Sheriff's Department. Counsel, let me start. You've referred twice now to perjury, and that occurred in court proceedings, right? It did, in more than one different court. And the witnesses were subject to cross-examination or not? They were. And the proceedings were subject where there was a right to appeal? There was a right to appeal. Actually, now that brings me to the question. Can you, what case has ever held that the due process clause gives a federal court jurisdiction to collaterally attack the credibility findings in a state court proceeding? That, sir, that's not the issue. The issue of child investigation cases or dependency cases that are corrupted by the perjury, we're not attacking those. We appealed successfully every single one of those. Wait, wait, wait. Counsel, wait a minute. To prevail on what you're arguing, the federal court would have to find that there was perjury in fabrication of evidence, right? On the record, that's very clear, Your Honor. There's a state statute in Arkansas. So you're saying you get summary judgment on that? I'm sorry, Judge? You say you get summary judgment on that? No, I'm saying that the qualified immunity should not be granted in light of the perjury. Wait, wait, wait. What I want, I'm focusing on the perjury, Counsel. Yes, sir. Was there been a finding by the state court that perjury was committed? No, sir. That's under investigation in a criminal court. So to prevail on this claim, you and a collateral attack of a state court proceeding would require the federal court to find that a witness committed perjury that was not found by the state court, right? And that's what you're, that's what you're arguing. And my question was, give me a federal court precedent for that. Well, Your Honor, that's not what I'm arguing. We're not attacking any judgment that came out of state court. Those judgments were, you're attacking, you're attacking the credibility of a witness in this federal proceeding, Judge, because her, her, her affidavit and Sergeant Wright's affidavit for that matter, I take it you have no case to answer in answer to my question. I don't, Your Honor. I haven't looked at that issue. Thank you. Counsel, what about absolute immunity with respect to the perjury issue? Um, we have cases going back along the ways that say absolute immunity applies in these circumstances. Well, the case that the circuit court relied upon in the case that both Garland County and the state police are relying on is Myers v Bull 1979 case. The facts of that case are practically night and day that this, in that case, the perjury that took place was during a deposition. It was, um, never submitted to the court. The judge never saw it. The jury never saw it. So the perjury that was alleged to have taken place in that case did not impact the whatever. In this case, we've got perjury that, um, direct testimony questioning by the judge and, um, DHS attorneys and the perjury and the fabrication of evidence in this instance was was the heart of the matter. In fact, investigator Finnegan, when asked what was the single most, um, egregious or the single most worrying factor before you remove the kids, she said it was the noxious fumes in the home. And there's other cases here. There's, you know, man's Manzano. I think it's pronounced 1995 case. We have a I mean, we have a line of cases. So even if you're right, the 1979 case is distinguishable. I can't figure out why absolute immunity wouldn't apply here. Absolute immunity in the Are you talking about in the, um, in the in Bull, it said that there was immunity for the time that the investigators was on the stand. Correct. Okay. In this case, there's so much more than that. Investigator Finnegan did perjure herself on the stand. The court did rely upon it. However, there were also affidavits that were sworn out. Um, the the falsification and fabrication of evidence didn't just take place on the stand. It took place before and after there. There are many, many instances here where exculpatory evidence was ignored in the investigation itself. The anything that was exculpatory was ignored, not not given to the court. So the it was more than simply just the testimony that was that was on the stand as far as the perjury is concerned. Well, just just to pin this down, it sounds to me like and I may agree with you, the fabrication of evidence, right, which is what you're getting out with the latter part of your answer. That's a separate sort of a separate point than than actually perjury. It seems to me the perjury is subject to absolute immunity and the rest of it may be a live claim for some other reason. Am I misinterpreting your answer here? Well, Judge, they were. It's really hard to separate the fabrication of evidence from the perjury because the fabricated evidence, much of it was simply the testimony that there were noxious schemes in the home. They didn't actually fabricate the noxious fumes. So they're fabricating circumstances that were designed to give the court pause in sending the Children back home. For that matter, the children were just seized. They were kept for six months and the the absolute absence of any physical evidence or any real corroborating evidence when when the investigators were at that house for five hours, if there was probable cause, even for argument's sake, let's say they had probable cause on the allegations after five hours, having 30 people stormed the house and finding absolutely nothing at some point that that probable cause, if it did exist, is going to lessen to the point that in this case it just simply dissipated. And when they realized that. Well, Counselor, it didn't totally dissipate. You had the risk. You had the risk of flight development. You had a 14 year old sister corroborating, however vaguely, what what two other what her two older siblings and two neighbors had already reported. Well, that's that's not entirely accurate, Judge. First, the flight of risk was not reasonable. If you look at the totality of the circumstances, it was it was a van that had some tents in an unknown boxes in it and it was 10 to 12 degrees. And you're talking about a family with seven children and a 74 year old father and a pregnant wife are not going to flee and escape in a it's not reasonable in light of all the facts. So in flight risk, if there were no other allegations or no other evidence for the rest of it, there's, you know, in America, we're still innocent until we're proven guilty. If they wanted to go somewhere, they certainly had every right to do so. No, we're talking about reasonable suspicion to take custody of children, reasonable suspicion of imminent harm or need for medical and further and medical investigation, right? And we're not talking about we're not talking about guilt beyond a reasonable doubt. Okay. Yes, sir. Correct. Now, reasonable suspicion, an issue of fact or law. In this case, reasonable suspicion is an issue of fact. What case what case what a circuit case supports that or Supreme Court? That's an issue of fact. Yes. I don't have one ultimate ultimate Fourth Amendment questions are variably issues of law when the Supreme Court finally gets around to reaching addressing the question. So yes, sir. Such a seizure or yes, sir. Yes, sir. I misspoke. All right. Thank you. But the law really is just the law. It doesn't mean much until a certain specific set of facts are applied to it. And when the certain specific set of facts of this case are applied to the law, no reasonable or competent investigator could could straight face to say that that there was reasonable suspicion. We can concoct it and we can come to an outcome based decision in nearly any case. But but the question in this case is, what did they know and when did they know it before the children were seized? And what they knew is that there was a complete absence of any real corroborating evidence or physical evidence to support these fantastic and numerous allegations of abuse. If it were simply that dad's beating us, or if it were simply that there's a chemical in the home, and there were no physical evidence that would be more reasonable than if you had bruising, striking, burning, poisoning, nutritional neglect, educational neglect, there were so many allegations, and not a single one of them had any physical evidence to back it up or real corroboration. And I say real corroboration because the both the state and the county have have hung on the on the fact that when Miss Finnegan did finally interview the two oldest children at the home that they corroborated the initial allegations. Well, those initial allegations started with Jonathan Stanley, and they knew that the advice from the the Children's Hospital pediatrician, Esquivel, that this could be dangerous, and the children should be tested further. She didn't actually say that. That's the way it turns out in the brief. But if you go to the letter, it's that's the way I read the district court's opinion. You didn't know that your court made a clearly erroneous finding. Well, I'm saying I'm not your honor. But if you read the letter, what Esquivel says is if ingested. Wait, I thought this was a phone call the night while they were during the five hours. Well, there was a phone call. I'm not talking about what happened later. Now. Now I'm well, now I'm focusing on the Fourth Amendment claims. Okay. The phone call was reflected or memorialized in a letter. And what the letter says is if the Children exhibit symptoms, then they should be tested further in the symptom. So let me stop you there in the summary judgment record. Is there any evidence submission by affidavit or otherwise that of what Miss Esquivel, Dr. Esquivel advised by phone? If I read this, didn't either Miss Finnegan or Sergeant Wright testify or by yes, and it's and it's basically what's contained in the letter that I don't care. I care about their testimony that the district court weighed in deciding the reasonable suspicion. I don't care what came along later in the court proceedings. If there were symptoms, Judge, then yes, there needed to be. But they brought a doctor with him. The seizure of the Children was premeditated. If you look at the the affidavit for search warrant, Sergeant Wright even admits that the state police have opened an investigation and they intend to remove the Children to be examined by a medical doctor. The removal of the Children was predestined and predisposed. Regardless, they brought their own doctor there to Brock. The doctor examined the Children and couldn't find anything wrong. So the these severe reactions and the severe symptoms the doctor Esquivel had had read about, she'd never heard of MMS prior to that phone call was was based upon the ingestion of MMS. There's no I have a basic question for you, which is who does the Fourth Amendment claim belong to? Who gets to assert it? And who gets to assert the substantive due process claim? Because you're the complaint in the briefing smushes them together, but I'm not so sure that they are smushable, so to speak. So the Fourth Amendment applies mostly to the Children in that the Children have a right to be free from unreasonable seizures of themselves. The 14th Amendment in due process applies to all the states, the protection in the right to a familial association and that fundamental liberty interest that arises when parents have Children that fund the analysis. The that's the answer I was looking for. The parents have the 14th Amendment claim, and the Children is the Fourth Amendment claim. Yes, judge, and they do cross. There's there's some elements that belong to both, but that's the clearest way to explain it that my simple mind can understand. Fourth Amendment Children, 14th Amendment parents. Thank you. The case that most puts this in a nutshell, and I'm I'm not able to see my clock. You're almost out of time, but so but I'll give you a couple minutes for rebuttal at the end. Thank you, Judge. I pass now to Miss Mary. If you had a final point, go ahead and make it. But the final point is this judge when it's a de novo review, we have to look at all of the facts and the circumstances. And when you when you take that in light of the case that came down in 2018, his Eighth Circuit is deemed the Searcy that quotes the Magna Carta for the fact that you can't frame people up. The overreaction by the department turned into circumstances that I counsel. I thought you were going to give us your best cases of wrap up. Okay, that would be deemed the Searcy judge. You can't fabricate evidence and frame people up in a court of law. If you do, the due process that should have attached to that proceeding is corrupted beyond reprieve. There's no chance that due process purges. Thank you. Ms. Merrill, are you next? Or is Mr. Dole? Good morning, Judge. It's me. I'll be first. And if I may proceed, please. Good morning, and may it please the court. My name is Jennifer Merritt, and I represent the Arkansas State Police affilies in this case. Major Ron Staton and investigator Kathy Finnegan. The district court dismissed all of the claims asserted against Major Staton on a 12B6 motion to dismiss because the complaint fled no fact that would state a clearly established constitutional violation against Major Staton. The district court also dismissed all of the claims against Kathy Finnegan but one, the claim based on the removal of the children. That decision was on January 12th, 2015, while Finnegan was at the Stanley home conducting a child maltreatment investigation concurrently with Garland County law enforcement who were there executing a search warrant looking for the MMS chemical that was allegedly harming the children. The material facts about what happened that night at the Stanley home should lead to only one conclusion on DeNovo review. Kathy Finnegan did not give rise to any liability in this case because she merely was doing her job. She reported, she interviewed the children, her findings to law enforcement, and let them make the decision as provided by state law. As I argued in the first appeal, Kathy Finnegan has no authority under state law. And as we rejected in the first opinion, square on. On that record. That's law of the case on that issue. And you, you insist on arguing again in your brief, citing the same pages that we referenced in the first opinion. Move on. Yes, your honor. There was reasonable suspicion to support Sergeant Wright's decision based on not one, but two different children. Two children were interviewed at the home on January 12th, 2015, both Jonathan and then his younger sister, the eldest sister living in the home. Both of them were interviewed at the home that night. They both provided detailed allegations of abuse to Finnegan and law enforcement also developed additional evidence as well as Finnegan that immediately preceded the removal decision. There's simply no evidence in the summary judgment record demonstrating that Finnegan violated the Stanley's clearly established rights. And this court should affirm in its opinion, affirming the district court's denial of qualified immunity at the pleading stage. The court was very clear. Reasonable suspicion does have to exist at the moment the children were removed from their parents' custody. And on remand, the parties engaged in exhaustive discovery. And as the district court found, all of the evidence pointed in one direction. Finnegan's father investigated by investigation by interviewing the two of his children. They separately and independently reported abuse to Finnegan through chronic repeated exposure to a toxic chemical that is similar to industrial grade bleach. The children were corroboration that occurred that developed during the five hours at the premises. Well, it was two children reported abuse. And under Myers, just the children's reports, a credible report of a child of abuse alone is enough. There does not have to be physical substantiation. There did not need to be any physical signs of abuse. If a credible report of a child of abuse by their own parents under a circuit controlling precedent is enough. One child's report of abuse is enough. But actually, two children were interviewed and reported abuse. In addition, the children both reported to Ms. Finnegan. She asked both of them separately and independently, what would happen if we left you here in the home tonight? And both Jonathan and his sister said, if you leave us here, our parents are going to pack us up and leave. Our van is packed. And so later on, Finnegan went out and opened the van and looked and found the van packed with tents and boxes full of belongings, just like the children said they were. So Finnegan reasonably believed that the family was a flight risk. And that is one of the health and safety factors that under the totality of the circumstances had to be considered. After Finnegan interviewed the two children and found the van packed, she went and shared her findings with Sergeant Wright. Both of the children said the MMS fumes burned their noses and burned their throats. They also reported that the sister reported suffering stomach aches and headaches from MMS exposure. She told Kathy Finnegan she suffered those ill health effects at the Stanley home that night. Kathy Finnegan believed those children, undisputed. The Stanleys don't dispute it. It's undisputed that Sergeant Wright believed the kids. In fact, they both testified in their deposition that they still believe the kids. And if they had to do it all over again, they really would go back and make the same decisions because they truly did believe the kids. So Finnegan reported her findings. That's the end of her role and her job under the way that Arkansas system works. Second, the Arkansas State Police did not just go on what they thought they knew about MMS. They called the Poison Hotline at the Arkansas Children's Hospital and consulted with a specialist there, Dr. Teresa Estevelle. And Dr. Finnegan's boss, Michelle Gatlin. So there's evidence in the summary judgment record. Gatlin testified at length because Gatlin is the one who had the most detailed conversation with Dr. Estevelle on the phone. And then Gatlin was passing in for information back at the home. Dr. Estevelle told Michelle Gatlin at the Crimes Against Children Division at the State Police Department that if MMS was in the home, that it could be fatal. And Dr. Estevelle told investigators, quoting from Michelle Gatlin's deposition, quote, that the children should not remain in the home if MMS was in the home. And that's at pages 960 and 61 of the appendix. Another more corroborating evidence was that law enforcement found multiple boxes of MMS at the Children's Hospital. They found an open bottle marked MMS with a hole in the top in the Stanley's refrigerator around their food. And they found more bottles of MMS in Mr. Stanley's bathroom and other places in the home. So they found the very chemical that children said was causing them health effects. Counsel, on that issue, factually speaking, I noted that it had a little label on it that said MMS. Was that ever chemically tested to determine whether it's MMS? I couldn't see that in the record. You know, Judge, they they did not. They were not able to get those chemically tested. The Garland County Sheriff's Department tried. And I believe they learned that there aren't any chemical tests available that could test the content of that box of that bottle. But what they did find was a bottle in the Stanley's refrigerator with a handwritten label that said MMS. It smelled, had a hole in it. And that's exactly what was reported by the original complainants that has set forth in the probable cause affidavit. And that's what the kids said, too, honestly. And then they, in fact, found the bottle of MMS in the fridge. And then there were more bottles of MMS. And there's really no dispute they had MMS in the home. In fact, the very next day when Braswell... I was going to ask, was there any contrary evidence? Was there evidence submitted there was no MMS in the home? No, Your Honor. No, there was multiple bottles of MMS in the home. And in fact, the very next day, when Tom Braswell, who was a DHS supervisor, went back to the Stanley's home, there was still MMS in plain sight. So no, Your Honor. So a state court judge considered all of these facts and circumstances about two weeks later in a probable cause hearing. There's a state court statute, Arkansas Constituted 927-306-A1C. That statute gives State Jurisdiction over probable cause and removal hearings after children are taken. And that's exactly what happened here. State court judge found that probable cause existed for the removal. State court judge also found that probable cause continued to exist to keep the Stanley children in state custody based on all of the totality of the circumstances. And the Stanleys have not provided any reason for this court to come in and second-guess that decision. Kathy Kennedy did not violate any clearly established rights of the Stanley family. And this court should affirm the summary judgment in the dismissal of her case. The Stanley's never went back and amended their complaint against Major Staten. They developed some evidence during discovery that they felt supported their claim against Major Staten. You're fainting. You're fainting out, counsel. I don't know if your mic is too far away or... I apologize. There's some loud signal coming from somewhere else, but I will conclude that the Stanley family has no facts against Major Staten to state a violation of a And the court should affirm the dismissal of Major Staten. Unless the court has questions, I will yield the remainder of my time to Mr. Newell. Thank you. Mr. Newell. Thank you, Your Honor. May it please the court. Looking at the facts in the light most favorably to the Stanleys, the district court correctly decided that the totality of the facts possessed by Sergeant Wright at the time of his removal order was objectively reasonable. Those facts consisted of the initial complaints and on-site interview with the two oldest Stanley children at the home, which included, very importantly, their fears that if they were not removed by DHS, state police, or the Garland County Sheriff's Department, that their parents would The strong recommendation of Investigator Finnegan, who had personally interviewed the two children. The recommendation of Deputy Lawrence, who had personally interviewed the two children, who was also told that they were scared of a flight risk. Most importantly, perhaps, the recommendation of two that Sergeant Wright did not act and take the children. The children may not have been removed had Sergeant Wright not acted. Let me ask counsel, I wasn't clear on. Dr. Kennedy was the physician on the scene that examined the children? That's correct. Did you say he recommended to Sergeant Wright the removal or to Ms. Finnegan? No, to be clear, he to a doctor their entire life. None of the seven children had ever seen a doctor until they were seen that night by the EMT, Dr. Kennedy. They were taken the next day to Arkansas Children's Hospital. But up until that point, physicians were a mystery to this family. And Dr. Kennedy was concerned about that. He said, hey, just because we don't find anything in the ambulance, what little testing we can do, they need to be seen by a physician. So in spite of all of those facts, Stanley's argued here and in summary judgment that Sergeant Wright, that there was no on-site medical evidence of abuse is what they say, citing what you mentioned, Judge Loken, that Kennedy said, well, I don't find anything, but they didn't mention that. And Stanley's are also critical of the failure to interview the five youngest children. But those two facts in context with what he otherwise knew are insufficient to defeat the overall objective reasonableness of Sergeant Wright's decisions. The Stanleys also argued in their briefs that later in the year, Finnegan was less than honest in state juvenile court hearings and that in 2018, three years hence, Wright was convicted on a guilty plea of theft of property. But whether there's reasonable suspicion of child abuse must be determined by the totality of the circumstances at the time of the removal. Reasonable suspicion is more than a hunch, but it's less than probable cause. But speaking of probable cause, Garland County Juvenile Court held a hearing 72 hours hence, in which consideration of all the facts known to the court affirmed the removal of the children. In fact, the order stated that immediate removal, the order found that immediate removal of the children was in their best interest and it was necessary to protect their health and safety. Counsel, talk to me about the perjury, which affects not only both Finnegan and Wright, but also affects other defendants as well. How would you approach the perjury allegation? My initial response is that nothing at the scene of the removal of the children, it doesn't, well, I would just say it doesn't, anything that existed does not affect reasonable suspicion of child abuse on the night of January 12, 2015. And that is the point at which the district court correctly determined that their qualified immunity issue must be resolved. So what did the district court do? Well, there was a cross-examination. There was, you know, the court consistently found in favor of the removal of the children. As a matter of fact, the court's order in March ended up being a consent order where the Stanleys agreed to continued separation with their children and agreed to parental counseling. And the children were returned in June of that year, having, after the case, the case worked itself out through juvenile court just the way it did. And I think that's what the district court should have. Does absolute immunity apply to the testimony that was given in the later court proceeding? I'm led to believe that it does. This is a solid summary judgment record for the Stanleys to be attacking here. There's no real argument made anywhere that Deputy Lawrence or Threadgill weren't entitled to qualified immunity either, even though it didn't, wasn't specifically mentioned in the district court order. There are simply no negative facts as to either arising out of the testimony that was given in the later court proceeding. Or arising out of the January 12th search and seizure. In considering qualified immunity, courts judge the actions and decisions, not the moral character of the actor. The actor could be a moral leper and be entitled to qualified immunity if his or her actions or decisions at the moment of impact were objectively reasonable under the circumstances. Consider the hypothetical consequences of Sergeant Wright's refusal to act, resulting in some calamitous outcomes feared by the Stanley children. Then, if Sergeant Wright had not removed him and something dreadful would have happened to the children, then Wright gets sued by the family for making an unreasonable decision to not remove the children. In that hypothetical case, Sergeant Wright would not be entitled to qualified immunity because he ignored too many facts, which should have reasonably alerted him to suspicion of child abuse. Here, Wright had ample facts. He had a duty to act. He acted with a duty to act. And finally, the Stanleys have presented no facts at summary judgment or here, which would cause reversal concerning official capacity liability. The sheriff was uninvolved at all times. There were no errors on January 12th or missteps attributable to Lawrence or Threadgill and the record has no allegations of any widespread custom or policy of bungled child abuse investigations, not even one. The district court's dismissal of the Stanley suit should be affirmed. Thank you, Mr. Churchwell. I promised you two minutes for rebuttals. So you're up. Thank you, Judge Logan. When Dr. Kennedy at the scene said that to be safe, he would recommend independent examination by a physician in facilities that were suitable to test. He didn't say that these children need to go right now. The exigency of the medical condition of the children was gone when that doctor on the scene said, I can't find anything, but if you want to be safe, do more. Those children could have been taken to the doctor the next day, just like Jonathan Stanley was. The problem is, if it was so important to get the children to these doctors, why did the investigators completely ignore the evidence that came out from those? The doctor the very next day said that he questioned Jonathan about symptoms and abuse, sexual and physical, and his response was negative to all of them. They were open-ended questions. That is exactly the opposite of what Jonathan told the investigators the night before. Finnegan, four years later, had never even seen that doctor's report. The investigation, if that doesn't shock the conscience, there's nothing illegal about the presence of MMS. There's no danger to any exposure to MMS in any of the documents that the federal government has put out by the FDA or anything other than ingestion of the MMS. There's been no evidence. In fact, the evidence was to the opposite. Even Jonathan and Victoria, when they were questioned at the home during that five-hour search, said that their father did not force them to drink MMS. All of the allegations were not substantiated by any physical or real corroborating evidence once they got there. So again, what they want you to do, Judge, is set a precedent that's saying as long as we believe a child, then that creates an exigency to remove that child from the home. And if that's the case, then our Fourth Amendment rights and our Fourteenth Amendment rights to fundamental liberty interests, if they give way to that small amount of evidence, that's not even really in the neighborhood of some credible evidence other than the opinion of that investigator that they do believe the child. And the danger is real. It's not well out of proportion because they're telling you here, even though they know what was wrong, Finnegan said she quit doing this because she didn't want to get hoodwinked again. But on the same thing, she says, look, if this happened again with the same circumstances, I would remove the children again. And that's the danger. There is no way to protect families if they're going to go into child abuse investigations with that kind of competency. Thank you, Judge. Thank you, counsel. The case has been thoroughly briefed and argued. It's a difficult situation, so the issues are important and we'll take it under advisement.